J-S42018-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: P.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.P., MOTHER | : | |
| | : | |
| | : | No. 461 EDA 2019 |

Appeal from the Order Entered, January 11, 2019,
in the Court of Common Pleas of Philadelphia County,
Family Court at No(s): CP-51-DP-0000535-2016.

| | | |
|---|---|---|
| IN THE INTEREST OF: P.W.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.P., MOTHER | : | |
| | : | |
| | : | No. 462 EDA 2019 |

Appeal from the Order Entered, January 11, 2019,
in the Court of Common Pleas of Philadelphia County,
Family Court at No(s): CP-51-AP-0000479-2018.

BEFORE:  OTT, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:          **FILED SEPTEMBER 16, 2019**

C.P. (Mother) appeals the order granting the petition filed by the

Philadelphia Department of Human Services (DHS) that involuntarily

terminated her parental rights to 4-year-old P.W.B. (Child) pursuant to the

_____

[*] Retired Senior Judge assigned to the Superior Court.

J-S42018-19

Adoption Act.[1] *See* 23 Pa.C.S.A. § 2511(a)(2), and (b). After review, we affirm.

We glean the relevant factual and procedural history from the trial court opinion filed pursuant to Pa.R.A.P. 1925(a):

> DHS originally became involved with this family on February 28, 2016, after DHS received a General Protective Services (GPS) report which alleged that police officers responded to a complaint regarding a domestic dispute at the home of Mother and Father; Father claimed that Mother locked him and Child out of the home and that Mother was under the influence of a substance and that Mother was not taking her prescribed medication; Child and Father had no resources for the night because Mother refused to open the door to the home for Child and Father; Mother was not cooperative with the responding police officers; eventually, police were able to obtain a telephone number for Paternal Grandfather; Child and Father went to the 19th District Philadelphia Police Station and were subsequently transported to Paternal Grandfather's home. This report was determined to be valid.
>
> On March 2, 2016, DHS went to the home of Mother. Mother admitted to using heroin and cocaine. Mother also stated that she was diagnosed with schizoaffective disorder and major depressive disorder, for which she was prescribed medication. Mother admitted that she was previously enrolled in an outpatient treatment program for her mental health issues, but she had not been compliant with the program for at least the previous month. Mother stated that she and Father had a dispute. In reaction to the dispute and the narcotics that she and Father were taking, Father became paranoid and left the home with Child. Mother stated that she then locked the door behind them and would not let them return to the home. Mother also indicated that she and father were under the influence of narcotics at the time of the incident on February 28, 2016. On that same

_____

[1] The trial court also terminated the rights of W.B. (Father); that appeal is part of a separate matter that is also before this panel.

day, DHS went to the home of Paternal Grandfather, where he and Child were present, while Father was at Friends Hospital being treated for substance use issues. Paternal Grandfather indicated that this was not the first time that he has cared for Child due to Mother and Father's inability to care for Child. Paternal Grandfather indicated that Mother had been using narcotics while she was in her treatment program and that he was interested in obtaining kinship care services for Child. DHS subsequently obtained an Order of Protective Custody (OPC) for Child.

On March 4, 2016, a shelter care hearing was held for Child. The trial court lifted the OPC, ordered that temporary commitment to DHS was to stand, and referred Mother to the Clinical Evaluation Unit (CEU) for a forthwith drug screen, and an assessment with dual diagnosis. At Mother's forthwith drug screen, Mother tested positive for alcohol, cocaine, opiates, and diluted creatine. [Footnote 3]

> **Footnote 3:** Creatinine is a by-product produced by human kidneys that enables the trial court to ascertain whether the individual is "washing" his or her urine by drinking substances before drug testing to dilute and mask any drugs in their urine. [Citation omitted].

On March 14, 2016, Child was adjudicated dependent and fully committed to DHS. The trial court referred Mother to the CEU for an assessment, a forthwith drug and alcohol screen with dual diagnosis, and three random screens. Mother was also referred for domestic violence counseling and Mother was ordered to comply with all Single Case Plan (SCP) objectives and recommendations. Between April 8, 2016 and May 12, 2016, Mother had eight positive drug screens at her treatment program, Chances.

On May 25, 2016, the SCP was revised. Mother's objectives were to attend and participate in individual and group therapy on a weekly basis; comply with the treatment recommendations; produce negative drug screens; sign all releases of information; successfully complete a treatment program; collaborate with the ICM as recommended; successfully complete a mental health program; attend and participate in parenting classes on a weekly basis; attend and participate in Child/Parent Psychotherapy on a weekly basis; attend and participate in a domestic violence

program; and participate in weekly visitation with Child, as ordered by the trial court.

On June 13, 2016, a permanency review hearing was held for Child. Mother was not present for this hearing. The trial court determined that Mother was fully compliant with the permanence review plan. The trial court ordered Mother to continue to comply with her objectives, ordered the CEU to continue to monitor Mother's treatment, and Mother was ordered to attend the Child/Parent psychotherapy program.

On August 22, 2016, a permanency review hearing was held for Child. Mother was present for this hearing. The trial court determined that Mother had been minimally compliant with the permanency plan. The trial court referred Mother to the CEU for a forthwith drug screen, an assessment, and three random drug screens. At Mother's forthwith drug screen, Mother tested positive for alcohol, cocaine, and diluted creatinine.

On September 13, 2016, a permanency review hearing was held for Child. Mother was present for this hearing. The trial court referred Mother to the CEU for an assessment, a drug and alcohol screen, and three random drug and alcohol screens. On October 4, 2016, Mother tested positive for alcohol and diluted creatinine. On November 10, 2016, Mother tested positive for diluted creatinine.

On September 29, 2016, the SCP was revised. Mother's objectives were to attend and participate in individual and group therapy weekly; comply with the treatment recommendations; produce negative drug screens; sign releases of information for the treatment program; successfully complete the treatment programs and receive a certificate; complete three random drug screens prior to the next court date, as ordered; collaborate with the intensive case manager (ICM) as recommended; attend and participate in Child/Parent Psychotherapy and receive a certificate; and participate in weekly visitation with Child as scheduled by the trial court order.

On November 21, 2016, a permanency review hearing was held for Child. Mother was present for this hearing. The trial court determined that Mother was fully compliant with the permanency review plan. The trial court referred Mother for a parenting capacity evaluation. Mother was also

referred to the CEU for a drug and alcohol screen and three random screens. Mother was ordered to sign releases and to continue to comply with all SCP objectives and recommendations.

On February 6, 2017, a permanency review hearing was held for Child. Mother was not present for this hearing. It was reported that Mother's attendance at Chances was sporadic and that she was discharged from the program because she was incarcerated. Mother was incarcerated at State Correction Institute (SCI) Muncy on December 15, 2016, and remains incarcerated.

On February 24, 2017, the SCP was revised. Mother's objectives were to attend and participate in individual and group therapy weekly; comply with the treatment recommendations; produce negative drug screens; sign releases of information for the treatment program; successfully complete the treatment programs and receive a certificate; attend and participate in Child/Parent Psychotherapy and receive a certificate; and participate in weekly visitation with Child as scheduled by the trial court order.

On April 17, 2017, and June 7, 2017, permanency review hearings were held for Child. Mother was not present for these hearings. Legal custody of Child remained with DHS.

On October 3, 2017, the SCP was revised. Mother's objectives were to attend and participate in the SCI Muncy drug and alcohol program; comply with the treatment recommendations; produce negative drug screens; successfully complete the treatment program and receive a certificate; attend and participate in the SCI Muncy mental health program; complete parenting classes at SCI Muncy; complete the virtual visitation orientation class; and to make herself available to participate in virtual visitation with Child.

On October 11, 2017, and January 10, 2018, permanency review hearings were held for Child. Mother was not present for this hearing [*sic*]. It was determined that Mother remained incarcerated and Mother was fully compliant with the permanency plan.

On April 5, 2018, a permanency review hearing was held for Child. Mother was not present for this hearing. It was determined that Mother remained incarcerated and Mother was substantially compliant with the permanency plan.

Child has been in DHS care since March 2, 2016. Mother has failed to place herself in a position to parent Child throughout the life of the case and remains incarcerated. DHS filed petitions to involuntarily terminate Mother's parental rights and change Child's permanency goal to adoption on June 7, 2018.

On September 24, 2018, a permanency review hearing was held for Child. Mother was not present for this hearing. It was determined that Mother remained incarcerated. The trial court ordered that all prior orders as to Mother were to stand. On this date, the trial court also began the termination and goal change trial for Child. Since Mother was unavailable to testify, the trial court ordered Mother's Counsel to make arrangements for Mother to be available via telephone, if Mother wished to testify at the continuation of the termination and goal change trial on January 11, 2019.

On January 11, 2019, the trial court continued taking testimony on the termination and goal change trial for Child. Mother participated in this trial via telephone. [Child] was appointed [legal counsel] and gave testimony regarding Child's wishes at the termination and goal change trial.[2] After all testimony was given, the trial court found clear and convincing evidence to change the permanency goal to adoption and to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

**See** Trial Court Opinion, 4/5/19, at 1-5 (citations to the record omitted)(footnote added).

---

[2] Child's interests were properly represented pursuant to 23 Pa.C.S.A. § 2313(a).

Mother represents in her brief that her parole had been granted and her release from prison was scheduled for May 21, 2019. *See* Mother's Brief at 12.

Mother filed a timely notice of appeal. She presents the following issues for our review:

1. Whether the trial court erred by terminating the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(a)(1) without clear and convincing evidence of Mother's intent to relinquish her parental claim or refusal to perform her parental duties?

2. Whether the trial court erred by terminating the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(a)(2) without clear and convincing evidence of Mother's present incapacity to perform parental duties?

3. Whether the trial court erred by terminating the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(a)(5) without clearing and convincing evidence to prove that reasonable efforts were made by DHS to provide Mother with additional services and that the conditions that led to the placement of Child continue to exist?

4. Whether the trial court erred by terminating the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(a)(8) without clearing and convincing evidence that the conditions that led to placement of the child continue to exist when Mother presented evidence of compliance with the goals and objectives of her Single Case Plan?

5. Whether the trial court erred by terminating the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(b) without clearing and convincing evidence that there is no parental bond between Mother and Child and that termination would serve the best interest of the child.

Mother's Brief at 7.

We review these claims mindful of our well-settled standard or review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotations marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation and quotation marks omitted).

In this case, the court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of 2511(a), as well as Section (b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Instantly, we analyze the trial court's decision to terminate under Section 2511(a)(2) and (b).

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

(b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(a)(2), (b).

Regarding Section 2511(a)(2), we have explained:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (citations, internal quotation marks, and indentation omitted).

Here, Mother argues there are no grounds to terminate her parental rights, because she resolved her issues while she was incarcerated. We do not discount Mother's progress during her incarceration. Indeed, she put her time to good use by participating in various programs. The questions are whether, in light of this programming, did Mother evince a present incapacity to parent Child, and whether that incapacity will be remedied?

We note that Pennsylvania recognizes that incarceration alone is not determinative of parental incapacity; however, it can be determinative in showing that a parent is incapable of providing essential parental care. *In re Adoption of S.P.*, 47 A.3d 817, 831 (Pa. 2012). "The child's need for consistent parental care and stability cannot be put aside or put on hold simply

because the parent is doing what she is supposed to do in prison." *In re E.A.P.,* 944 A.2d 79, 84 (Pa. Super. 2008). Parental rights cannot be preserved by a parent waiting for a more convenient time to fulfill their parental duties. *In re D.J.S.*, 737 A.2d 283, 287 (Pa. Super. 1999).

We do not ignore the fact that Mother could presently be out of prison, but we are careful not to speculate. At the time of termination hearing, Mother faced incarceration for another 22 months. If we are to consider the possibility that Mother has been released from incarceration, an acceptable inference would be to ponder how long Mother could stay sober and out of prison; after all, Mother's present incarceration stemmed from a 2004 felony drug conviction. Mother had been incarcerated multiple times for violations of her probation. Even according to Mother, she would need to spend an indeterminate amount of time in a half-way house following her release. In other words, this case is not as simple as Mother would have us believe. Consider, for instance, Mother's significant incapacity prior to her incarceration.

During the six months between Child's dependency adjudication and Mother's incarceration, Mother could not produce negative drug screens, much less fulfill any other reunification goal. Only after her incarceration, could Mother even begin to straighten herself out. And while Mother's sobriety is unquestionably the first step toward providing adequate parental care, it does not equate parental care.

This is to say nothing of Mother's mental health issues, which also require a high level of attention. Mother was placed in the mental health unit at SCI Muncy, which is considered to be a residential treatment center with a psychologist present at all times. Mother's placement in the mental health unit is based on her depression and schizoaffective disorder.

Regarding the first prong of the termination analysis, the trial court concluded that DHS provided clear and convincing evidence demonstrating Mother's incapacity to parent, that incapacity has caused Child to go without necessary parental care, and that Mother cannot remedy the causes of this incapacity. This conclusion was not an abuse of discretion.

Next, we consider whether termination was proper under Section 2511(b). With regard to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include [i]ntangibles such as love, comfort, security, and stability.... [T]his Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d at 267 (internal case citations omitted).

Here, Mother contends that she and Child still have a strong emotional bond notwithstanding her incarceration, because she was the primary

caregiver for the first 17 months of Child's life prior to his removal. Mother argues that she continued to strengthen the bond with Child during her incarceration via virtual visitation and telephonic communication. The trial court concluded otherwise, and we discern not abuse of discretion.

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citing *In re K.K.R.–S.,* 958 A.2d 529, 535–536 (Pa. Super. 2008)). The mere existence of an emotional bond does not preclude the termination of parental rights. *Id*., 93 A.3d at 897-898; *see also In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *Id*. at 898 (citation omitted). Beyond the presence of the bond, the trial court can equally emphasize the safety needs of the child, and should also consider the intangible, such as the love, comfort, security, and stability the child might have with the foster parent. *See In re Adoption of C.D.R.*, 111 A.3d at 1219.

Mother claims that she sent Child cards, letters, and gifts, but the caseworker testified that the foster parent received no such correspondence from Mother. Child was outside of Mother's care for nearly three years at the

time of the termination hearing. During that time, the foster parent provided for Child's daily needs. Child refers to the foster parent as "Mommy"; he considers the other child in the home to be his sibling; he turns to the foster parent for support and stability. Even if Mother is correct that a bond still exists between her and Child, the trial court found that such a bond was not so beneficial that Child would suffer irreparable harm if the bond was severed.

Regarding the second prong of the termination analysis, the trial court concluded that DHS provided clear and convincing evidence that termination would best serve Child's needs and welfare. We conclude that this determination was not an abuse of discretion.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/16/19